UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HENRY L. MILLER,

Plaintiff,

Civil Action No. 17-12788
Honorable Thomas L. Ludington
Magistrate Judge David R. Grand

v.

NANCY A. BERRYHILL,

Defendant.
__________________________________/

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 17]**

Plaintiff Henry L. Miller ("Miller") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [16, 17], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Miller is not disabled under the Act. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [17] be GRANTED, that Miller's Motion for Summary Judgment [16] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II. REPORT

### A. Procedural History

On December 31, 2014, Miller filed an application for SSI, alleging a disability onset date of March 6, 2007.[1] (Tr. 104, 167, 180, 198). This application was denied at the initial level. (Tr. 104). Miller filed a timely request for an administrative hearing, which was held on June 22, 2016, before ALJ Jan Leventer. (Tr. 32-64). Miller, who was represented by attorney Frank Cusmano, testified at the hearing, as did vocational expert ("VE") Donald K. Harrison. (*Id.*). On August 5, 2016, the ALJ issued a written decision finding that Miller is not disabled under the Act. (Tr. 18-31). On June 27, 2017, the Appeals Council denied review. (Tr. 1-6). Miller timely filed for judicial review of the final decision on August 24, 2017. (Doc. #1). The parties filed cross-motions for summary judgment (Docs. #16, #17), and Miller did not file a reply.

**B. Framework for Disability Determinations**

Under the Act, SSI benefits are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

[1] Miller previously filed two other SSI applications, which were denied in two separate decisions by two different ALJs. The first application was denied by ALJ E. Patrick Golden on July 23, 2009 (Tr. 65-75); the second was denied by ALJ Patrick J. MacLean on March 25, 2013. (Tr. 38, 76-90).

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C. Background**

*1. The Record*

Miller alleges disability as a result of a heart condition. (Tr. 184). At the time of the administrative hearing, Miller was 5'6'' tall and weighed 167 pounds. (Tr. 46). He went to school through ninth grade. (Tr. 46, 185). The most recent job he listed was working as a mover in 2006.[2] (Tr. 217).

The Court has thoroughly reviewed the record in this matter, including Miller's medical record, Function Report, Disability Reports, and testimony as to his conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and

---

[2] Miller also listed prior jobs as a stocker and machine operator, but indicated that he did not know the dates in which he held them. (Tr. 217). At the same time, in an undated Disability Report he wrote that he was not currently working and "ha[s] never worked." (Tr. 184).

provide citations to the record as necessary in its discussion of the parties' arguments.

*2. Vocational Expert's Testimony*

Donald K. Harrison testified as an independent VE at the administrative hearing. (Tr. 57-61, 220-22). The ALJ asked the VE to imagine a hypothetical individual of Miller's age, education, and work experience (with no prior relevant work) who was limited to sedentary work with the following additional limitations: the individual can carry up to ten pounds and can lift or carry up to ten pounds maximally; can stand and/or walk with normal breaks for a total of two hours in an eight-hour workday; can sit with normal breaks for a total of six hours in an eight-hour workday; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs; can occasionally climb, balance, stoop, crouch, kneel, and crawl; must avoid all exposure to extreme cold and extreme heat; must avoid excessive humidity; must avoid irritants such as fumes, odors, dust, and gases and must avoid poorly ventilated areas; and must avoid all exposure to unprotected heights, moving machinery, and vibrations. (Tr. 58). The VE testified that the hypothetical individual could perform jobs that exist in the national economy, in categories such as: assembly (Dictionary of Occupational Titles ("DOT") number 739.687-066; unskilled; Specific Vocational Preparation ("SVP") level 2; 100,000 jobs); packing, for example, pharmaceutical packer (DOT number 559.687-014; unskilled; SVP level 2; 85,000 jobs); and inspecting, for example, optical inspector (DOT number 716.687-033; unskilled; SVP level 2; 75,000 jobs). (Tr. 59).

The ALJ then asked the VE to imagine an individual with the same limitations as in the first hypothetical but with the additional limitation that the individual would be off task 20% of the workday. (*Id.*). The VE testified that this person could perform no jobs in the national economy. (*Id.*).

The VE also testified that if in addition to the limitations in the first hypothetical, the individual had to take three to four unscheduled breaks during the workday, each lasting about fifteen minutes at a time, all work would be precluded. (Tr. 60). Similarly, the VE testified that if the individual had to lay down once every workday for an hour to an hour and a half, such a limitation could not be accommodated at any job. (Tr. 60-61). The VE stated that a person could be absent up to one and a half days per month and still retain employment. (Tr. 60).

The VE testified that his testimony was consistent with the DOT and the Selected Characteristics of Occupations ("SCO"), except for the portion on time off task. (Tr. 59-60). The VE averred that because the DOT and SCO are silent on that issue, that part of his testimony was based on his over twenty-five years of professional experience. (Tr. 60).

**D. The ALJ's Findings**

At Step One of the five-step sequential analysis, the ALJ found that Miller has not engaged in substantial gainful activity since December 31, 2014, the application date. (Tr. 24). Next, the ALJ found that Miller has the severe impairment of cardiomyopathy status post-implantable cardioverter defibrillator ("ICD"). (*Id.*). At Step Three, the ALJ found that Miller's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (*Id.*).

The ALJ then found that Miller retains the residual functional capacity ("RFC") to perform sedentary work except that he can lift or carry up to ten pounds maximally; he can stand and/or walk (with normal breaks) for a total of two hours in an eight-hour workday; he can sit (with normal breaks) for a total of six hours in an eight-hour workday; he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps or stairs; he can occasionally climb, balance, stoop, crouch, kneel, and crawl; he must avoid all exposure to extreme cold or extreme

heat, excessive humidity, irritants such as fumes, odors, dust, and gases, and poorly ventilated areas; and he must avoid all exposure to unprotected heights, moving machinery, and vibrations. (Tr. 24-25). In doing so, the ALJ adopted the March 25, 2013 RFC finding of the prior ALJ pursuant to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997); *Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir. 1990); and Acquiescence Rulings 98-3(6) and 98-4(6). (Tr. 21); *see supra* note 1.

At Step Four, the ALJ concluded that Miller has no past relevant work. (Tr. 26). At Step Five, the ALJ found that considering Miller's age, education, work experience, and RFC, he can perform the following jobs that exist in significant numbers in the national economy: bench assembler, pharmaceutical packer, and optical inspector. (Tr. 26-27). As a result, the ALJ concluded that Miller is not disabled under the Act. (Tr. 27).

**E. Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**F. Analysis**

In his summary judgment motion, Miller argues: (1) the ALJ erred in applying *Drummond* and Acquiescence Ruling 98-4(6) by not finding a worsening of his condition since the prior 2013 decision; and (2) the ALJ violated the treating physician rule in evaluating the opinion of Brian A. Barbish, M.D. These arguments are addressed below.

*1. The ALJ Did Not Err in Applying Drummond and Acquiescence Ruling 98-4(6) by Finding that Miller Had No New or Greater Limitations Since the Prior 2013 Decision*

Miller argues that the ALJ "erred in applying *Drummond* as there is evidence after the prior ALJ decision dated March 25, 2013 that shows a worsening in [Miller's] condition." (Doc. #16 at 10). Miller argues that he was "prejudiced as a result of the ALJ improperly applying the SSA ruling and *Drummond*," and he seeks reversal of his case and an immediate award of benefits. (*Id.*). The Court finds Miller's argument unpersuasive and concludes that reversal and an award of benefits is not appropriate.

In *Drummond*, the Sixth Circuit held that "a subsequent ALJ is bound by the findings of a previous ALJ . . . absent new and additional evidence." *Drummond*, 126 F.3d at 842. *See also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) ("In order to be awarded benefits for her condition since [a prior denial], [the claimant] must demonstrate that her condition has so worsened in comparison to her condition [as it existed in the prior adjudicated period] that she was unable to perform substantial gainful activity."). Applying *Drummond*, courts have held that to avoid the preclusive effect of a prior ALJ decision, the claimant (1) must produce new and material evidence and (2) that evidence must also show that the claimant's condition worsened since the prior decision. *See, e.g.*, *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011) ("Plaintiff misapprehends the scope of [the *Drummond*] test. Plaintiff must not merely present new and material evidence, but that evidence

must show that plaintiff's condition *deteriorated* from the state of her condition at the time the ALJ made the decision.") (emphasis in original); *Makinson v. Colvin*, No. 5:12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) ("In order to avoid the application of *Drummond*, a claimant must present evidence showing that her symptoms have changed since the time of the Commissioner's prior determination."). *Drummond* is applied "only to a finding of a claimant's [RFC] or other finding required at a step in the sequential evaluation process for determining disability . . . made in a final decision by an ALJ or the Appeals Council on a prior disability claim." *Acquiescence Rul. 98-4(6)*, 1998 WL 283902, at *3 (June 1, 1998). Subsidiary findings, such as those pertaining to a claimant's credibility, do "not constitute a finding that is *required* at a step in the sequential evaluation process for determining disability[.]" *Id.* at *3 n.5 (emphasis in original). Thus, absent evidence that Miller's condition worsened, the ALJ was required to presume that he still had the same RFC and that he still was not disabled, as determined by the prior ALJ. *See Hicks v. Comm'r of Soc. Sec.*, No. 15-12329, 2016 WL 4577048, at *6 (E.D. Mich. Aug. 15, 2016) ("[A]n ALJ must adopt a finding of a claimant's RFC . . . made in the final decision by an ALJ . . . unless new and additional evidence or changed circumstances provide a basis for a different finding.").

In her decision, the ALJ, citing *Drummond*, specifically found that the "medical records following the [March 2013] decision do not show new or greater limitations by [Miller], which warrant . . . findings on the present claim" that deviate from the prior RFC to perform a reduced range of sedentary work. (Tr. 21). The ALJ concluded that "[t]herefore, I am bound by the prior decision." (*Id.*). In reaching this conclusion, the ALJ noted that "[d]espite [Miller's] allegations of severe and worsening symptoms, the record documents a history of largely stable and normal findings." (Tr. 26). For example, the ALJ noted that a January 2014 physical examination

revealed regular cardiac rate and rhythm with normal S1 and S2. (*Id.*). She also noted that an October 2014 stress echo revealed a left ventricular ejection fraction ("LVEF") of 40-45% with no inducible ischemia. (*Id.*). The ALJ considered that in November 2014, a physical examination revealed regular cardiac rate and rhythm with no extremity edema and that records from January 2015 document no complaints of chest pain, palpitation, tachyarrhythmia, orthopnea, dyspnea on exertion, or proximal nocturnal dyspnea. (*Id.*). The ALJ also considered that in September 2015, Miller's blood pressure was found to be "adequately controlled." (*Id.*). Furthermore, the ALJ cited a record from November 2015 where Miller reported "doing well with no significant complaints, no new worsening [chest pain] episodes, [and] no [shortness of breath]." The ALJ saw that in June 2016 a myocardial evaluation revealed no scintigraphic evidence of ischemia and only a mild left ventricular dysfunction of 48%. (*Id.*). Based on her review of the record, the ALJ concluded that Miller is able to sustain work as detailed in the RFC because "[a]lthough the medical evidence of record confirms [his] diagnoses, the conditions have produced no greater restrictions than those identified and have been managed with conservative treatment." (*Id.*).

The ALJ's conclusion that the medical evidence since March 2013 does not show a worsening of Miller's conditions is supported by substantial evidence. Between 2013 and 2016, Dr. Barbish regularly found that Miller's review of systems revealed no chest pain, palpitation, tachyarrhythmia, orthopnea, dyspnea on exertion, or paroxysmal nocturnal dyspnea (Tr. 231, 234, 237, 243, 293, 322, 339, 345, 348) and that upon physical examination his peripheral pulses were present overall and equal bilaterally; his heart had regular rate and rhythm, normal S1 and S2, and no gallops, rubs, or clicks; the point of maximal impulse ("PMI") was not displaced or was focal; there was no right ventricular lift; his jugular venous pressure ("JVP") was normal;

there were no audible carotid bruits; and he had no edema in his extremities. (Tr. 229, 233, 235, 238, 244, 295, 324, 340, 346, 350). On June 19, 2014, Raymond C. Hilu opined that Miller was "doing well overall" and noted that his systolic heart failure "improved" with an ejection fraction from 20% to 45%. (Tr. 273). On May 12, 2014, Miller's heart had regular rate and rhythm and S1 and S2 were not found to be abnormal. (Tr. 276).

A review of systems by Ali H. Shakir, M.D., on November 12, 2014 found that Miller had no chest pain, palpitation, tachyarrhythmia, orthopnea, dyspnea on exertion, or paroxysmal nocturnal dyspnea, and in addition, no syncope, presyncope, dizziness, or lightheadedness. (Tr. 240). A physical examination revealed that Miller's heart had regular rate and rhythm; normal S1 and S2; no S3, S4, murmur, click or rub; his PMI was not displaced; his JVP was normal, and his carotid bruits were not audible. (Tr. 241). Dr. Shakir noted that Miller "has done well" since his ICD implantation in 2007 and "has done well with his cardiomyopathy which has remained relatively well compensated." (Tr. 240). Physical examinations conducted on December 5, 2012 and February 27, 2015 also showed that Miller's heart had normal rate, regular rhythm, normal S1 and S2, and no murmur; on the later date, his PMI was also not displaced. (Tr. 264, 268).

Similarly, on May 29, 2015, Miller was negative for chest pain, peripheral edema, and syncope, and his heart had normal rate, regular rhythm, normal S1 and S2, no murmur, and his PMI was not displaced. (Tr. 325-26). As pointed out by the ALJ, medical records from November 19, 2015 indicate that Miller was doing well and that he had no significant complaints, no new worsening chest pain episodes, and no shortness of breath. (Tr. 317). Those same records indicate that on that date his heart had regular rate and rhythm and S1 and S2 were present. (*Id.*). On January 6, 2016, Michael S. Kern, M.D., recorded that Miller was "asymptomatic"; he denied chest pain, shortness of breath, and leg swelling; and his heart had

regular rate and rhythm. (Tr. 296). Two months later, on March 4, 2016, a physical examination revealed that Miller's heart had normal rate and regular rhythm and that he had good pulses equal in all extremities. (Tr. 329). On multiple occasions, various medical providers noted that Miller's ambulation status was within normal limits. (Tr. 264, 268, 311, 306, 326). All of this evidence strongly supports the ALJ's finding that there was no significant change in Miller's condition following the prior ALJ's March 2013 decision.

Miller cites to two pieces of evidence, which he believes "clearly show[] a worsening of [his] condition." (Doc. #16 at 11). First, Miller points to a November 21, 2013 report that his heart condition "was classified as [C]lass III under the New York Heart Association Functional Class [S]ystem."[3] (*Id.* at 10). Miller contends that because he was previously designated to have Class II functional capacity, "moving from a slight limitation to a marked limitation would result in a worsening of [his] condition." (*Id.*). But Miller does not point to records that document any functional limitations that he actually experienced as a result of being designated in Class III (as opposed to when he was in Class II). Moreover, as the Commissioner points out, Miller was only given a Class III designation on a single date – November 21, 2013 – and on that date, Frederick Michael, D.O., instructed Miller to continue on the same medications and to get some lab tests done after finding that Miller's heart had regular rate and rhythm and his chest was clear. (Tr. 278). Following this visit, Miller was then given a Class II designation on November 12, 2014; December 5, 2014; February 27, 2015; and May 29, 2015. (Tr. 240, 263, 267, 325).

The second piece of evidence Miller points to is a Physical RFC Questionnaire filled out

---

[3] Miller defines a Class III designation as meaning "marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea." (Doc. #16 at 10). Meanwhile, Miller states that "Class II only notes that the patient would have a slight limitation of physical activity and ordinary activity causes fatigue, palpitation, or dyspnea." (*Id.*). Where he provides these definitions in this part of his motion, Miller does not provide the source he referenced for these two definitions.

by Dr. Barbish on May 16, 2016. (Doc. #16 at 10-11). Miller contends that Dr. Barbish previously opined that he would be limited to working at the sedentary level; however, the RFC opinion from May 16, 2016 limited him to less than sedentary work. (*Id.* at 10). But the ALJ gave the most recent RFC opinion limited weight "because it is inconsistent with the objective medical evidence of record." (Tr. 26). As discussed in detail below, that aspect of the ALJ's decision is supported by substantial evidence.

In sum, Miller has not demonstrated that the ALJ's decision to be bound to the prior 2013 decision – including its RFC – was erroneous. To the contrary, it is supported by substantial evidence.

*2. The ALJ did not Violate the Treating Physician Rule*

Miller argues that the ALJ violated the treating physician rule because she did not provide "good reasons" for giving Dr. Barbish's RFC opinion limited weight and because the decision to give it limited weight "is not supported by substantial evidence." (Doc. #16 at 11). The Court disagrees.

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)). Thus, an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a

treating source" unless it is well-supported and consistent with the record as a whole. SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). Accordingly, "the Sixth Circuit has held that '[a]n [ALJ] may give more weight to the opinions of examining or consultative sources where the treating physician's opinion is not well-supported by the objective medical records.'" *Kilkolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at *9 (quoting *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. 2014)), *report and recommendation adopted*, 2016 WL 1357900, at *6 (E.D. Mich. Apr. 5, 2016).

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good reasons" for the weight given to a treating source opinion)). "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 242). That a treating physician's opinion is inconsistent with the record constitutes a "good reason" for not giving controlling weight to it. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417-18 (6th Cir. 2011).

As mentioned above, on May 16, 2016, Dr. Barbish provided an RFC opinion regarding Miller's physical impairments. (Tr. 332-35). He indicated that he had treated Miller for ninety-six months[4] and that Miller's diagnoses included dilated cardiomyopathy, status post-ICD in 2007, and hypertension, for which his prognosis was "[f]air." (Tr. 332). Dr. Barbish wrote that Miller's symptoms include dyspnea, fatigue, and intermittent chest pain that is characterized by heaviness and soreness, is located over his left chest, and is exacerbated by certain activities. (*Id.*). Where asked to list "the clinical findings and objective signs," he identified chronic systolic congestive heart failure and chest pain. (*Id.*). Dr. Barbish indicated that Miller's medical treatment and ICD monitoring "may have implications for working." (*Id.*). He wrote a check mark indicating that Miller's impairments have lasted or can be expected to last at least twelve months. (*Id.*).

Dr. Barbish opined that if Miller was placed in a competitive work situation, he would have functional limitations as a result of his impairments. (Tr. 333-35). In particular, Dr. Barbish assessed that Miller is likely to be off task for at least 25% of a typical workday and is incapable of even "low stress" jobs. (Tr. 333). Dr. Barbish estimated that he could walk half a city block without rest or severe pain, sit for more than two hours at one time, and stand for fifteen minutes at one time. (*Id.*). Meanwhile, he estimated that in an eight-hour workday, Miller could sit for a total of about two hours and stand/walk for a total of less than two hours. (Tr. 334). Dr. Barbish indicated that in an eight-hour workday, Miller needs to walk every sixty

---

[4] Though it appears to the Court that Dr. Barbish wrote "96 months" in response to the question asking for the "frequency and length of contact" (Tr. 332), the Commissioner interprets Dr. Barbish's handwriting as indicating a treatment relationship of "about six months." (Doc. #17 at 10). The Commissioner's interpretation appears at odds with both the present record (which shows Dr. Barbish treated Miller at least as far back as July 12, 2013 (Tr. 223-24)) and the prior administrative decisions (which show Dr. Barbish's treating relationship with Miller dates back at least to September 2008 (Tr. 71). Regardless, for the reasons stated herein, the Court finds the ALJ's decision is supported by substantial evidence.

minutes for five minutes at a time. (*Id.*). He opined that Miller needs a job that allows him to shift positions at will from sitting, standing, or walking. (*Id.*). In addition, he opined that Miller needs to take three to four unscheduled breaks, lasting fifteen minutes each, during an eight-hour workday. (*Id.*). Dr. Barbish found that Miller does not need a cane or other assistive device for standing/walking; however, he indicated that with prolonged sitting, Miller's legs should be elevated one to two feet, and in a sedentary job, they should be elevated for two hours out of an eight-hour workday. (*Id.*). Dr. Barbish wrote check marks indicating that Miller can rarely lift less than ten pounds and never lift ten, twenty, or fifty pounds. (*Id.*). He also wrote check marks indicating that Miller can rarely twist, stoop (bend), crouch/squat, and climb stairs – but never climb ladders. (Tr. 335). Finally, Dr. Barbish opined that Miller is likely to have "good days" and "bad days" and is likely to be absent from work about four days per month as a result of his impairments or treatment. (*Id.*).

The ALJ specifically considered Dr. Barbish's opinion, evaluating it as follows: "I afford limited weigh[t] to this opinion because it is inconsistent with the objective medical evidence of record. As described above, the record documents a history of controlled and stable cardiac symptoms . . . ." (Tr. 26).

Miller takes issue with the ALJ's decision to give Dr. Barbish's opinion limited weight. (Doc. #16 at 13-15). He argues that the ALJ's conclusion that Dr. Barbish's opinion "is inconsistent with the objective medical evidence of record" is explained in "a simple conclusory" statement and is not supported by the evidence in the record. (*Id.*). These arguments lack merit.

As for Miller's argument that the ALJ's explanation consists of a "simple conclusory" statement, such an argument neglects the sentence that comes right after the one he cites, which says: "As described above, this record documents a history of controlled and stable cardiac

symptoms." (Tr. 26). The ALJ details the medical evidence as to this "history of controlled and stable cardiac symptoms" in the paragraph immediately preceding the one analyzing Dr. Barbish's opinion. *See supra* at 9-10. Thus, as the Commissioner points out, Miller's argument "fails to acknowledge that the ALJ referenced the evidence she was relying on to support her determination that Dr. Barbish's opinion was not consistent with the objective evidence in the record." (Doc. #17 at 13).

Miller argues that the objective evidence in the record supports Dr. Barbish's opinion; in particular, a July 12, 2013 echocardiogram "which was significant for concentric left ventricular hypertrophy; impaired left ventricular systolic function; thickened and calcified mitral valve; and mitral regurgitation." (Doc. #16 at 13). But while Miller characterizes these results as "significant," the actual record indicates that Dr. Barbish concluded that Miller had *mild* concentric left ventricular hypertrophy; *mildly impaired* overall left ventricular systolic function; and *mild to moderate* mitral regurgitation. (Tr. 223).

Miller points to other evidence that he believes supports Dr. Barbish's statement: the Class III designation; a 45% ejection fraction on May 29, 2015; and a January 16, 2016 diagnosis of "uncontrolled hypertension." (Doc. #16 at 13-14). In Miller's view, "[t]hese records support Dr. Barbish's opinion, especially the inability to lift/carry in a competitive work situation and the ability to stand/walk for less than 2 hours and sit only about 2 hours in an 8-hour workday" because "less than ordinary activity causes fatigue, dyspnea, or palpitation." (*Id.* at 14). Yet Miller does not explain what functional limitations result from each of the three pieces of evidence he cites and the impact that each one would have on his RFC, even though he had the burden of providing the existence and severity of the functional limitations caused by his conditions. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); 20 C.F.R. §

416.912(c) (establishing that claimants bear the responsibility of providing evidence showing how their impairments affect their ability to work). Moreover, Miller asserts that "less than ordinary activity causes fatigue, dyspnea, or palpitation" but does not specify what condition(s) cause this and does not point to where in the record this appears. Nor does he reconcile it against the evidence discussed above which supports the ALJ's *Drummond* analysis and RFC determination.

Regardless, the evidence Miller cites does not support Dr. Barbish's opinion on Miller's ability to lift/carry and stand/walk. The Court has already addressed Miller's Class III designation, which was only assigned to him once and sheds no light on his functional limitations. *See supra* at 12. While Miller did have a "mildly decreased" 45% LVEF on May 29, 2015, this same record indicates that on that date, Miller was given a *Class II* designation, no effect on his daily activities was identified, and Miller reported no chest pain, no peripheral edema, and no syncope. (Tr. 325, 327). In addition, Miller's blood pressure was controlled, his cardiovascular examination was normal, his musculoskeletal system had normal range of motion and no swelling, and he had a change in his activity tolerance and was able to tolerate walking greater than two blocks.[5] (Tr. 325-27). This last finding is directly inconsistent with Dr. Barbish's opinion that he can only walk half a block (Tr. 333); it therefore supports the ALJ's decision to give Dr. Barbish's opinion limited weight.

Finally, as for his hypertension diagnosis, "the mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual." *McKenzie v. Comm'r, Soc. Sec. Admin.*, 215 F.3d 1327 (6th Cir. 2000). As

[5] This same finding regarding Miller's change in activity tolerance and ability to tolerate walking greater than two blocks was also made on February 27, 2015. (Tr. 263). On this date, no effect on his daily activities was identified either. (*Id.*).

the Commissioner points out, the ALJ did not find Miller's hypertension to be a severe impairment at Step Two, and Miller does not challenge this determination. (Doc. #17 at 16). Nor does he point to any functional limitations resulting from this diagnosis, as noted above. *See supra* at 17. The Commissioner also rightly highlights that on multiple occasions Miller's hypertension was characterized as benign (Tr. 264, 266, 268, 300, 305, 310, 317, 320, 326), controlled, or adequately controlled (Tr. 230, 237, 239, 241, 243, 245, 293, 295, 318, 320, 322, 324, 327, 329, 339, 341, 345, 348). (Doc. #17 at 16).

Additional evidence in the record also supports the ALJ's treatment of Dr. Barbish's opinion. On June 28, 2013, Dr. Barbish's physical examination of Miller found that his general appearance was well developed, he had normal body habitus, he was in no acute distress, and his breathing was clear. (Tr. 229). Similar findings were again made by Dr. Barbish on January 10, 2014; July 11, 2014; October 17, 2014; January 19, 2015; May 18, 2015; September 28, 2015; May 16, 2016; May 18, 2016; and December 18, 2016, along with that Miller's head, ears, eyes, nose, and throat were normal and that he had no edema in his extremities. (Tr. 233, 235, 238, 244, 295, 324, 340-41, 346-47, 349-50). Likewise, a review of systems by Dr. Barbish on these same dates noted that Miller had normal activity and energy level and no malaise, chills, fever, or diaphoresis. (Tr. 231, 234, 237, 243, 293, 322, 339, 345, 348).

On February 27, 2014, Miller reported back pain to Dr. Michael that became worse after sitting or standing for long periods; however, he experienced this pain after moving furniture. (Tr. 277). Miller reported that the pain did not limit his activity and he had no weakness, numbness, or tingling. (*Id.*). A straight leg raising test was negative. (*Id.*). Following this appointment, Miller denied having pain. (Tr. 272, 276). On November 12, 2014, Dr. Shakir – like Dr. Barbish – found that Miller had normal activity and energy level; had no malaise, chills,

fever, or diaphoresis; and was in no acute distress. (Tr. 240-41). Dr. Shakir also found that Miller's head, ears, eyes, nose, and throat were normal, his lungs were clear, and he had no edema in his extremities. (Tr. 241). Normal results for physical examinations and reviews of systems were later recorded by other medical providers as well. (Tr. 263-64, 268, 296, 317-18, 325-26, 329). Notably, on December 5, 2014, Miller's musculoskeletal system had normal range of motion and normal strength, and his mobility/gait, muscle tone, upper extremity examination, spine/torso examination, and lower extremity examination were all within normal limits. (Tr. 268). As mentioned above, Miller's ambulation status was commonly within normal limits. (Tr. 264, 268, 311, 306, 326).

This Court's job is not to re-weigh the evidence, but to review the record to determine whether it contains substantial evidence in support of the ALJ's conclusions. *Cutlip*, 25 F.3d at 286; *Blakley*, 581 F.3d at 406; *Reynolds*, 424 F. App'x at 414 ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."). As explained above, substantial evidence supports the ALJ's conclusion that the record "documents a history of controlled and stable cardiac symptoms." *See supra* at 10-12, 18-19. Thus, the ALJ's decision to give Dr. Barbish's opinion little weight is supported by substantial evidence.

Miller recognizes that the ALJ is not required to do a factor-by-factor analysis under the treating physician rule, but nevertheless argues that "it is clear that [the ALJ] did not consider . . . all [the factors under the rule]" – in particular, the treating relationship, the nature and extent of the treating relationship, the consistency of the opinion with the record as a whole, the specialization of the treating source, or the supportability of the opinion. (Doc. #16 at 14). But the ALJ did consider the consistency of Dr. Barbish's opinion with the record as a whole; this

factor appropriately formed the basis of her decision to give his opinion limited weight. (Tr. 26). As mentioned above, that a treating physician's opinion is inconsistent with the record constitutes a "good reason" for not giving it controlling weight. *Reynolds*, 424 F. App'x at 417-18. Accordingly, the ALJ properly considered Dr. Barbish's opinion and provided a "good reason" for giving it little weight. Substantial evidence supports the ALJ's decision, and Miller's argument as to Dr. Barbish's opinion lacks merit.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Miller's Motion for Summary Judgment [16] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: May 29, 2018
Ann Arbor, Michigan

s/David R. Grand
DAVID R. GRAND
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not

preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 29, 2018.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager